694 So.2d 336 (1996)
STATE of Louisiana
v.
Kevin Phillip LEDET.
No. 96 KA 0142.
Court of Appeal of Louisiana, First Circuit.
November 8, 1996.
*338 Stephen P. Callahan, Houma, for State.
Edward James Gaidry, Jr. and Margaret S. Sollars Houma, for Defendant-Appellant.
Before SHORTESS and LeBLANC, JJ., and TANNER,[1] J. Pro Tem.
SHORTESS, Judge.
Kevin Phillip Ledet (defendant) was charged by bill of information with two counts of forcible rape, La. R.S. 14:42.1, and one count of oral sexual battery, La. R.S. 14:43.3, occurring on or about May 4 and 5, 1994.[2] The victim is defendant's daughter, who was twelve years old at the time of the offense. He was tried and convicted on all counts. The trial court granted his post-trial motions on the count of oral sexual battery but denied the motions on the rape counts.[3] On the first rape count, the court sentenced defendant to fifteen years imprisonment, two years of which are to be served without benefit of probation, parole, or suspension of sentence. On the second rape count, the court sentenced defendant to twenty-five years imprisonment, five of which are to be served without benefit of probation, parole, or suspension of sentence. The court also ordered defendant to serve the second sentence consecutively to the first.
Defendant has appealed his convictions and sentences. He originally asserted nine assignments of error, but two were expressly abandoned in his brief. The remaining assignments of error center around five issues: (1) denial of challenges for cause of four jurors, (2) admission of defendant's videotaped statement, (3) admission of the victim's videotaped statement, (4) sufficiency of the evidence, and (5) length of sentence.

FACTUAL BACKGROUND
Defendant and his wife, Deborah A. Ledet (Ledet), separated about 1983 when the victim, who was born March 7, 1982, was less than one year old. Although they were not legally divorced until 1995, they rarely communicated. In 1994, the victim and Ledet were living in Mississippi. The victim, who had no memory of her father, decided she wanted to meet him. Ledet located defendant in Houma, Louisiana, where he was *339 living with Celia M. Garcia, Garcia's son from a previous relationship, and three children born to defendant and Garcia.
On May 1, 1994, Ledet drove the victim and her younger sister to Houma. Ledet stayed in a hotel in Houma for a few nights while the children spent the night in defendant's home. When Ledet was ready to return to Mississippi, the victim asked to stay with her father. Over Garcia's objections, defendant and Ledet agreed she could visit for one month.
After about three weeks, Ledet returned to Houma and got her daughter, apparently at the request of both the victim and Garcia. Upon her return home, the victim complained of vaginal pain and itching. Ledet took her to a doctor and then questioned the victim as to whether anyone had touched her improperly. In light of the victim's responses to her questions and the doctor's findings, Ledet took her to the Houma Police Department (HPD). She reported to Detective Milton Wolfe, Jr., that the victim had been raped by defendant. Wolfe questioned the victim and then videotaped an interview with her.
Defendant was arrested and then interrogated at the HPD's office. He gave a recorded statement and consented to a physical examination by Dr. Sharif Sakla, which was performed at Terrebonne General Medical Center.

CHALLENGES FOR CAUSE
Defendant contends the trial court erred in denying his challenges for cause of four jurors: Jill Allemand, Ronnie Duplantis, Glenda Harper, and Sherry Spiers. Louisiana Code of Criminal Procedure article 797 provides that, among other grounds, a defendant may challenge a juror for cause because he is not impartial or he will not accept the law as given to him by the court. The trial court's refusal to excuse a prospective juror on the ground he is not impartial is not an abuse of discretion if, after further inquiry or instruction, the juror demonstrates a willingness and ability to decide the case impartially according to the law and the evidence. State v. Copeland, 530 So.2d 526, 534 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989). However, a challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice, or inability to render judgment according to law may be reasonably implied. State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990). The trial court is vested with broad discretion in ruling on a challenge for cause, and its ruling will not be disturbed on appeal absent a showing of abuse of discretion. State v. Robertson, 92-2660, p. 4 (La.1/14/94), 630 So.2d 1278, 1281.

Jill Allemand
Allemand stated on voir dire she had a cousin who was a sergeant with the Louisiana State Police, but she felt this would not cause her to favor either party in this case. She also had a cousin who allegedly had been raped, but the alleged rapist was acquitted. She stated she was not particularly close to that cousin. The prosecutor asked her, "How did you feel about thatthat whole circumstance? Did you feel like the right thing was done ... ?" She replied, "I actually think that she's someone that can sometimes make a story seem much worse than it actually is." She stated this would not affect her ability to sit on this particular case.
Defendant contends Allemand's relationship to a state trooper and the acquittal of her cousin's alleged rapist justify granting a challenge for cause. We disagree. Relationship to a law enforcement officer is not, of itself, a ground for a challenge for cause. Rather, the question is whether the prospective juror could assess the credibility of each witness independently of his relationship with members of law enforcement. State v. Ross, 95-1240, p. 3 (La.App. 1st Cir. 5/10/96), 674 So.2d 489, 492. Allemand stated unequivocally her relationship to her cousin, the trooper, would not influence her decision. She also stated her other cousin's experience would have no effect on her. We find no abuse of the trial court's discretion in denying defendant's challenge for cause of this juror.

*340 Ronnie Duplantis

During the initial voir dire, jurors were asked if they felt "that maybe Mr. Ledet must have done something since he's sitting here today." Duplantis answered affirmatively. When asked to elaborate, he replied, "Well, I mean, he's sitting there, he may have, he may have admitted it." The court later conducted the following colloquy with Duplantis:
BY THE COURT:
I have one or two questions. Mr. Duplantis, in response to [defense counsel's] questions concerning the defendant's innocence, the law is that a person is presumed innocent. Can you put aside the feelings you may have and listen to the evidence in this case if you were to be chosen, or do you feel that you don'tyou have a problem with that presumption of innocence?
BY JUROR DUPLANTIS:
I don't have a problem.
BY THE COURT:
Okay. You feel you can start off from scratch andin other words, if y'all took a vote right now, do you feel your vote would have to be not guilty? If the only evidence
BY JUROR DUPLANTIS:
Right.
BY THE COURT:
If the D.A. said, "Okay, that's my case," without the evidence, could you find him innocent?
BY JUROR DUPLANTIS:
Right. He's not guilty until he's proven, he's proven.
In his brief, defendant contends this colloquy did not serve to rehabilitate Duplantis because the facts in the court's hypothetical have "nothing to do with this case." Defendant further contends Duplantis did not show he understood the burden of proof. In our opinion, Duplantis's answers, taken as a whole, show he understood the State had the burden of proving defendant's guilt. Thus, the trial court did not abuse its discretion in denying defendant's challenge for cause of this juror.

Glenda Harper
Harper testified her ten-year-old male cousin was raped and murdered about three or four years before this trial. The rapist was tried and convicted. The court questioned Harper regarding the effect this would have on her:
BY THE COURT:
Would that affect your ability to sit on this case?
BY JUROR HARPER:
I don't think so. It's very much still in my mind. He was ten years old.
BY THE COURT:
If you were instructed to put that aside do you feel you could put that aside without that being something
BY JUROR HARPER:
Yes, I could.
Harper was later questioned by the prosecutor:
BY [PROSECUTOR]:
Let me ask you this, Miss Harper: If you were asked to do something by the court, could you set aside that fact, the fact that that's a very emotional issue obviously for you?
BY JUROR HARPER:
I think so.
BY [PROSECUTOR]:
So you could listen to the evidence and be fair to bothnot just to the State but also to [defense counsel] and [defendant]?
BY JUROR HARPER:
I think so.
BY [PROSECUTOR]:
You know [defendant] wasn't involved in that? He deserves a fair trial. Correct?
BY JUROR HARPER:
I understand that.
Depending on one's vocal inflection, the phrase "I think so" can be equivocal. In this case, the trial court heard Harper's answers and witnessed her facial expressions and body language during voir dire. It is because of the trial court's superior position to make such judgment calls that we use an abuse of discretion standard of review.
*341 This case is distinguishable from State v. Jones, 623 So.2d 877 (La.App. 1st Cir.), writ denied, 629 So.2d 419 (La.1993), in which we found a defendant's challenge for cause should have been granted because of equivocal answers. In Jones, the prospective juror had been employed by the state police for twelve years. She indicated she would "do [her] best" to put aside her tendency to favor law enforcement but if all else were equal she might lean toward the State. That juror never stated unequivocally she could put aside her feelings, while in the instant case Harper, when asked if she could put her feelings aside, answered, "Yes, I could." For these reasons, we find no abuse of discretion by the trial court in denying defendant's challenge for cause of Harper.

Sherry Spiers
Spiers stated her father had been car-jacked and kidnapped in another state about a month before the trial. She answered unequivocally that she was not biased toward persons charged with crimes and that this would not affect her ability to sit on this case. She also indicated she would like to see her father's kidnappers caught and punished but felt it would not happen.[4] Defendant contends this statement indicates Spiers is biased against criminal defendants. We find the desire to see one who has harmed a loved one arrested and convicted is normal and not indicative of bias against all persons charged with crimes. Thus, we find defendant's challenge for cause was properly denied; the trial court did not abuse its discretion.

DEFENDANT'S STATEMENT
A defendant may move on any constitutional ground to suppress a confession or statement of any nature he has made. La. C.Cr.P. art. 703(B). The burden of proving the admissibility of a statement or confession of a defendant is on the State. La.C.Cr.P. art. 703(D). The State must prove beyond a reasonable doubt the voluntariness of a confession or statement which the defendant has moved to suppress. State v. Rodrigue, 409 So.2d 556, 561 (La.1982). In reviewing the trial court's ruling as to the admissibility of such a statement, its conclusions on credibility are entitled to the respect due those made by one who saw the witnesses and heard them testify. Id.
Wolfe and Detective Jude McElroy arrested defendant at work on July 19, 1994. Wolfe testified he verbally advised defendant of his constitutional rights but did not question him at work. Wolfe and McElroy took defendant to the HPD office where McElroy again advised defendant of his rights in Wolfe's presence. Defendant then signed a form which stated he had been informed of his rights and understood them. Wolfe testified defendant did not ask for an attorney and indicated he would give a statement. Wolfe and Lieutenant Johnny Lopez, HPD Chief of Detectives, conducted a preliminary interrogation and then took a videotaped statement.
At the beginning of the videotaped statement, Wolfe showed defendant the "advice of rights" form. Defendant admitted the form had been read to him earlier, and he acknowledged he understood his rights. Wolfe then went over defendant's constitutional rights one more time, and defendant stated affirmatively he understood each of them. He further stated he knew what he was doing, he had not been coerced, threatened, or tricked, and no promises had been made to him.
Wolfe testified defendant remained in his physical presence from the time he was taken into custody until the interview was concluded. He testified he neither made any promises or threats to defendant, nor did he or any member of the HPD intimidate defendant. Lopez denied threatening defendant in any manner, including threatening to take away his children. During the hearing on the motion to suppress, Wolfe testified Lopez and McElroy may have raised their voices in anger when questioning defendant because of the nature of the alleged crime, but they *342 never made any threats toward him. Lopez, however, testified both at the hearing and at trial that he never raised his voice or screamed at defendant. Lopez also denied defendant ever came into his office.
Defendant, on the other hand, testified that while Wolfe was questioning him, Lopez constantly screamed and yelled at him. He alleged Lopez then calmed down and called him into his office. Lopez then told him if he did not give a statement that he "did do something with this girl," Lopez would charge him with seven counts of aggravated rape and have his other children taken away from him. Defendant testified he believed the threats because "Child Welfare" had removed two of his children from his care in the past.
Defendant argues that because his testimony and the testimony of the police officers conflict, the State has failed to prove voluntariness beyond a reasonable doubt. We disagree. A defendant cannot prevent the admission of a confession or statement simply by testifying the statement was not given voluntarily. Where there is a conflict in the testimony, the court must determine the credibility of the witnesses; it is not bound to accept the defendant's testimony over the police officers'.
The trial court, after listening to the testimony of the witnesses and viewing the videotape, ruled the State had borne its burden of proof. It obviously found unconvincing defendant's testimony that he admitted having sexual relations with his twelve-year-old daughter only to prevent his other children from being removed from his custody. The trial court was particularly impressed by the appearance of defendant on the videotape. The court noted defendant did not appear to be under duress or coercion, the interview was conducted slowly, and defendant seemed relaxed. We have viewed the videotape and agree with the trial court. For these reasons, we find the trial court did not err in denying defendant's motion to suppress and in allowing the videotaped statement into evidence. These assignments of error have no merit.

THE VICTIM'S STATEMENT
Wolfe videotaped a statement of the victim, and the prosecutor properly advised defendant of the State's intent to use it at trial. Defendant then moved to suppress the statement, contending it did not comply with all the requirements of Louisiana Revised Statute 15:440.5.
Revised Statute 15:440.4(A) provides five requirements which must be satisfactorily proven before such a videotape can be considered competent evidence. Revised Statute 15:440.5(A) provides eight requirements, some of which overlap those in 15:440.4(A), for the videotape to be admissible. Defendant contends one requirement of 15:440.5(A) was not met, that of 15:440.5(A)(5) that "[e]very voice on the recording" be identified, and thus argues the videotape should have been suppressed.
On the videotape, the victim and Wolfe are sitting in chairs near a closed door which did not open during the taping. Wolfe testified no other persons participated in the interview, and no attorneys or relatives of the victim were present. However, there are background sounds or voices on the tape to which Wolfe and the victim appear to pay no attention. When we listened to this tape, we could understand no specific spoken words from the background noises, although they seemed to emanate from several different people, both male and female. Wolfe identified the sounds as the police department intercom system. He testified it remains on twenty-four hours a day unless a special request is made to turn it off, and he simply forgot to request it be turned off at the time he took the victim's statement. He further stated that other than the intercom sounds, the only voices heard on the videotape are his and the victim's.
Revised Statutes 15:440.4 and 15:440.5 are designed to ensure the reliability of a child's statement. We believe the purpose of 15:440.5(A)(5) is to identify anyone who might have influenced the outcome of the interview by questions, comments, or responses. Defendant has not alleged, nor has he shown, that these "voices" belonged to anyone participating in or listening to the interview or anyone in the same room with *343 Wolfe and the victim. Wolfe "identified" these "voices" as the police intercom system, and, in our opinion, that identification is sufficient under the particular facts of this case. Thus, the trial court did not err in denying defendant's motion to suppress and in admitting the videotaped statement at trial.

MOTION FOR NEW TRIAL
Defendant contends the trial court erred in denying his motion for new trial based on the cumulative effect of the errors alleged above. For the reasons expressed in the preceding discussions of defendant's assignments of error, this assignment is also without merit.

SUFFICIENCY OF THE EVIDENCE
Defendant contends the trial court erred in not granting his motion for post-verdict judgment of acquittal. In reviewing claims challenging the sufficiency of the evidence, this court must consider, "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979).
Rape is defined in Revised Statute 14:41(A), as follows:
A. Rape is the act of anal or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.
B. Emission is not necessary and any sexual penetration, vaginal or anal, however slight is sufficient to complete the crime.
Forcible rape is defined in Revised Statute 14:42.1(A) as:
a rape committed where the anal or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
Debra Ledet testified she and defendant separated when the victim was an infant, and the victim had not seen her father since she was one year old. In 1994, while they were living in Prentiss, Mississippi, the victim decided she "wanted to meet her daddy." Ledet located defendant through his grandparents and took the victim to Houma. She had mixed feelings about defendant at that time. She had gone for years without knowing whether he was dead or alive but had never divorced him. She stated she still had some feelings toward him at the time, and they had sexual relations during the visit.
Ledet testified she did not originally intend for the victim to stay with defendant. After they had visited two or three days, however, the victim and defendant both begged her to let the victim stay. Ledet decided to let her stay for one month. She talked to the victim on the telephone almost every day. Three weeks into the visit, the victim asked Ledet to come get her.
Ledet testified she discovered the victim was bleeding vaginally when they got home. She thought the victim had started her period, but when she also complained of pain and itching, she took her to a doctor. After the doctor's examination, Ledet asked the victim if anyone had been touching her improperly. Based on the victim's answers and the doctor's findings, she went to the police in Mississippi. They told her she would have to go to Houma to report the crime, which she did.
Portions of the victim's videotaped statement were played for the jury,[5] and she testified as well. She testified she had always wanted to meet her father, and it was her idea to go to Houma. In her statement she said they arrived on Sunday, May 1. On the following Wednesday, she and defendant were home alone during the afternoon. She stated he pulled her down to the floor and *344 took off her clothes. He was naked. She never agreed to or wanted to have sex with him. He got on top of her and put his "private" either on or in her. She stated, "I don't know if it went in meit just hurt." While he was on her, she told him he had better stop. He told her to "shut up."
At trial she testified that before she told him to stop, she pushed against his chest without success. She also testified he forcibly pushed her legs apart, although she tried to keep them together. She did nothing else physically to try to stop him because she was afraid of him. Before this assault he had hit her a few times on the arms when she refused to touch his penis. In her statement, she said she was afraid he would have hurt her badly if she had fought with him because "[h]e's bad on drugs and he's crazy."
She also testified he put his mouth on her "private" and "sucked at" it. She tried unsuccessfully to push his head away.
She stated he ejaculated on her, then told her this was their secret. He also told her if she ever told anyone, she would have to go to a foster home and he would go to jail. It was almost time for Garcia to come home, so she grabbed her clothes and went into the bathroom. Garcia arrived about ten minutes later. She did not tell Garcia about the assault because she believed Garcia would think it was consensual.
The victim's description in her statement of the second encounter was as follows. Defendant did not go to work the next day. Garcia left, and the other children went to school. She was lying on the couch watching television when defendant came in the room, turned off the television, and lay on top of her. He was clothed, and he did not remove her clothing. She stated unequivocally he did not take her panties off, pull them down, or push them aside. He put his penis on her, not in her, and it did not hurt like the first time. She stated she did not see his penis. She reiterated in her trial testimony that during the entire second encounter they were both clothed.
Defendant's counsel tried to show through cross-examination of the victim that Ledet was using her daughter to get revenge on defendant for their marital breakup. The victim testified on cross she had heard her mother say bad things about defendant before their visit to Houma, but on redirect she stated her mother began to talk negatively about defendant only after she found out what he had done to the victim. During the visit to Houma, she had witnessed no animosity between her parents. She said her mother now thought defendant was "a lousy man" and she "hates his guts."
Defendant did not testify, but his videotaped statement was shown to the jury. His version of the two encounters is as follows. On the first day, he and the victim were lying on the couch when she began to talk about how she had been raped by her mother's brother when she was nine years old. They were home alone in the afternoon. He was wearing only a pair of shorts, and she was wearing only a shirt and panties. He got an erection from listening to her talk. She removed her panties and told him she wanted to show him what her uncle had done to her. He removed his shorts and kissed her neck, breasts, and vagina.[6] He then began to rub his penis on her vagina.
Wolfe interrogated defendant as to whether there was any degree of sexual penetration, as follows:
Wolfe: Did you put it in her private part?
Defendant: Well, all I did was rub it. I didn't put it in.
Wolfe: Did you try to?
Defendant: Not really. Well, rubbing it, you know.
Wolfe: Did you try to put yourdid you put your private partwhen you say "on," what do you mean, her lips?
Defendant: Well, yeah, in between her lips and just rubbed it.
Wolfe: Okay. But you're saying that you didn't fully go into her.
Defendant: I didn't go into her at all besidesyou know, the outer
*345 He stated that after he ejaculated, she lay on the couch and wanted to do it again, but he refused because he "couldn't."
The second time was a few days later when they were again home alone. He was lying on the couch wearing only shorts when she came out of the bathtub wearing only a shirt. She lay beside him on the couch and started rubbing his penis. She said she wanted to "do it." He did not kiss her vagina or breasts that time but did "pretty much the same thing" as the first time.
Defendant stated the victim kept trying to get him to have sex with her again, but he refused. "It didn't feel right for me after the second time," he said. He denied making any threats to her or telling her it was their secret.
Garcia testified she did not want the victim to stay with them, but defendant wanted to get to know his daughter. She stated the victim caused trouble the entire time she was at their house. She finally called Ledet's sister-in-law at 3:00 a.m. and told her if Ledet did not come get the victim, she was turning her over to child welfare authorities. Ledet came immediately and got the victim. Garcia denied the victim and defendant were ever home alone. She stated whenever she left the house, the victim wanted to go with her.
The prosecution implied throughout the trial that defendant had transmitted genital herpes to the victim. Dr. Sharif Sakla, a board-certified emergency room physician and deputy coroner for Terrebonne Parish, testified that, based on his visual examination of defendant's genitals on July 19, 1994, defendant had herpes. Dr. Bruce E. Gaidry examined defendant on July 29, 1994, and found "no sign of genital herpes." A culture for herpes was negative, while a blood test was positive, but Sakla testified neither test was reliable. However, the doctor who examined the victim in Mississippi did not testify, and no evidence was introduced to show the victim had any type of sexually transmitted disease.
Finally, the defense attempted to show the victim's story was not believable by pointing out that defendant's work records, which were introduced by the State, show he worked on May 4 and 5. The same records show, however, he took personal leave on May 2 and 3 and left early on May 4. The victim testified she was not sure of the dates and if she was wrong about them, "[i]t was just a lousy mistake."
In our opinion, the evidence is more than sufficient to sustain defendant's conviction on the first count of forcible rape. The victim testified that she did not agree to have sex with defendant, that she tried to push him away and to keep her legs together, and that she did not fight any harder because she was afraid defendant would hurt her. The victim was uncertain whether there was sexual penetration during the first assault; she knew only that what defendant did caused her pain. Defendant's own videotaped statement, however, settles the issue of whether there was penetration. While he tried to minimize his actions by stating he rubbed his penis only between the outer lips of the victim's vagina and did not fully penetrate her, Revised Statute 14:41(B) is clear that "any sexual penetration, vaginal or anal, however slight is sufficient to complete the crime." Thus, this assignment of error is without merit as to the first count of forcible rape.
Defendant's conviction on the second count of forcible rape, however, is disturbing. Defendant testified that in their second sexual encounter, he and the victim had sexual relations. The victim, however, testified he lay on her while they were both clothed. She stated he did not "mess with" her clothes, she did not see his penis, and he did not penetrate her. Neither the testimony of the victim nor the testimony of defendant alone is sufficient to prove forcible rape.
To conclude defendant committed forcible rape, the jury must have believed defendant's testimony that there was sexual penetration, but disbelieved the remainder of his testimony. At the same time, it must also have believed the victim's testimony that defendant used force but disbelieved everything else she said. Such irrational beliefs cannot support the conviction.
*346 Accordingly, we find a rational trier of fact could not have concluded beyond a reasonable doubt that the State proved the second count of forcible rape.
If an appellate court finds the evidence, viewed in the light most favorable to the State, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense. La.C.Cr.P. art. 821(E). One responsive verdict to forcible rape is sexual battery. La.C.Cr.P. art. 814(A)(10). Revised Statute 14:43.1 defines sexual battery, in pertinent part, as the intentional touching of the genitals of a person using any instrumentality or body part of the offender. The State need not prove the offender used force or compulsion when the victim is under fifteen years old and at least three years younger than the offender. Defendant's self-described actions constitute the crime of sexual battery.[7] At the time of the assault, defendant was thirty-one and the victim was twelve. He admitted intentionally rubbing his genitals on the victim's. Thus, we must modify defendant's conviction on the second count of forcible rape. A judgment of conviction of the lesser offense of sexual battery is hereby rendered, and this matter is remanded to the trial court for resentencing on the modified judgment of conviction.

EXCESSIVE SENTENCE
The trial court sentenced defendant to fifteen years on the first rape count and twenty-five years on the second and ordered the sentences served consecutively. Defendant contends this total of forty years is excessive. He also contends that under the sentencing guidelines contained in Code of Criminal Procedure article 894.1, he should have been sentenced to no more than eight and one-half years.
In light of our modification of the second rape count, we must vacate the twenty-five-year sentence and remand for resentencing on the conviction of sexual battery.[8] Thus, we need now determine only whether a sentence of fifteen years on the first count is excessive.
Defendant's fifteen-year sentence falls within the statutory penalty range of five to forty years. La. R.S. 14:42.1(B). A trial court should give weight to the sentencing guidelines and must state for the record the considerations taken into account and the factual basis for the sentence imposed. La. C.Cr.P. art. 894.1(B) and (C).[9] The trial court is not required to list every aggravating or mitigating factor as long as the record shows ample consideration of the guidelines. State v. Smith, 93-0402 (La.7/5/94), 639 So.2d 237, 240. Article 894.1's goal is to require an adequate factual foundation for the sentence, not to force a rigid or mechanical recitation of the factors. Thus, even without full compliance with article 894.1, remand is unnecessary when the record clearly reflects an adequate basis for the sentence. State v. Lanclos, 419 So.2d 475, 478 (La.1982); State v. Milstead, 95-1983, p. 8 (La.App. 1st Cir. 9/27/96), 681 So.2d 1274.
The trial court herein considered article 894.1's sentencing guidelines and enumerated for the record a factual basis for imposing sentence. It clearly rejected the guidelines. The court noted defendant has a previous criminal record of petty crimes, and it felt there was an undue risk defendant would commit another crime if the sentence were *347 suspended. The court stated it felt serious harm was done to the victim, defendant's own daughter, particularly in light of her previous molestation by her uncle. The court stated it believed the victim and termed defendant's story that she was trying to seduce him "ridiculous." The court further noted defendant did not seem to understand his actions were wrong.
The trial court has great discretion in imposing sentence within the statutory limits. We may not set aside the sentence for excessiveness if the record supports the sentence imposed, La.C.Cr.P. art. 881.4(D). We may do so only if the trial court clearly abused its discretion. State v. Lobato, 603 So.2d 739, 751 (La.1992).
A sentence is constitutionally excessive if it is grossly disproportionate to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. It is disproportionate if it shocks our sense of justice when considering the crime and punishment in light of the harm to society. Lobato, 603 So.2d at 751. Louisiana Constitution article 1, section 20, prohibits such an excessive sentence. A sentence may be excessive even though it is within statutory limits. State v. Sepulvado, 367 So.2d 762, 767 (La.1979).
We find no abuse of discretion in the trial court's fifteen-year sentence. It is not grossly disproportionate to the crime's severity when considered in light of the emotional harm to the twelve-year-old victim, his own daughter. Ledet testified the victim was recovering emotionally from being raped by her uncle and was a trusting child before she went to visit her father. Now she is having problems controlling her behavior and has lost her sense of trust. The maximum length of incarceration for forcible rape is forty years. Defendant's fifteen-year sentence is not so disproportionate as to shock our sense of justice. Accordingly, we find no merit to defendant's claim his sentence on the first rape count is excessive.

PATENT ERROR
We routinely review the record for patent error. We have found an error in the sentence. Although the minutes indicate the court credited defendant for time served, the transcript shows the court did not give defendant that credit. See La.C.Cr.P. art. 880. Rather than remanding for resentencing, we simply order defendant be given credit for time served, and the district court shall amend the commitment if necessary. See La.C.Cr.P. art. 882.

PROTECTIVE ORDER
Revised Statute 15:440.6 requires a videotape of a child's statement admitted under Revised Statute 15:440.5 be preserved under a protective order of the court to protect the privacy of the child. The trial court failed to issue such an order. We hereby order the videotape of the victim's statement herein be placed under a protective order.

CONCLUSION
The trial court properly admitted the videotaped statements of defendant and the victim and properly denied defendant's challenges for cause. On the first rape count, we find the evidence sufficient to support defendant's conviction. On the second rape count, we find the evidence insufficient to support a conviction of forcible rape but sufficient to support a conviction of sexual battery. We further find defendant's sentence on the first rape count was not excessive.
Accordingly, we affirm defendant's conviction and sentence on the first count and remand with an order to amend to give defendant credit for time served. We modify the conviction on the second count of forcible rape to the lesser charge of sexual battery, vacate the sentence, and remand for resentencing. Finally, we place the videotape of the victim's statement under a protective order.
COUNT 1, FORCIBLE RAPE: CONVICTION AND SENTENCE AFFIRMED, WITH ORDER. COUNT 3, FORCIBLE RAPE: MODIFIED JUDGMENT OF CONVICTION RENDERED; SENTENCE VACATED; REMANDED FOR RESENTENCING. *348 PROTECTIVE ORDER ISSUED.
NOTES
[1] Judge Thomas W. Tanner, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The May 4, 1994, rape was Count 1; the oral sexual battery was Count 2; the May 5, 1994, rape was Count 3.
[3] Defendant filed both a motion for new trial and a motion for post-verdict judgment of acquittal. It is unclear from the record which motion was granted. The trial court, without elaboration or stated reasons, ruled: "The Court will grant the post-trial motions on ... the charge of Oral Sexual Battery."
[4] Defendant relies on Spiers' statement, "I'd like to see the people who were caught and punished, but that's not going to happen." It is obvious from the context she is referring to her father's kidnappers. Defense counsel's quotation of this statement in brief omits the word "the" preceding "people." Based on this misquotation, defendant implies Spiers wants to see all criminals caught and punished.
[5] The entire videotape was introduced into evidence. Portions of the victim's statement are clearly inadmissible. The court record indicates the parties agreed to show only part of the statement to the jury. We were hampered in our review of this case, however, by the court reporter's failure to record and transcribe the portions actually played for the jury. Without a transcript, we were forced to view the entire tape and make an educated guess as to what the jury actually heard and saw.
[6] The trial court granted defendant's post-trial motions on the oral sexual battery charge but gave no reasons. The State did not exercise its right to appeal or seek supervisory writs under Code of Criminal Procedure article 821(D).
[7] Because defendant's statement provides sufficient evidence to support a conviction of sexual battery, we need not determine whether defendant's actions as described by the victim, i.e., touching her through her clothing, also constitute sexual battery. However, we note in State v. Bouton, 615 So.2d 23, 25-26 (La.App. 3d Cir. 1993), the court held that "skin on skin contact is not necessary for a sexual battery. A sexual battery can be committed by touching through clothing."
[8] On resentencing, we note the case of State v. Brown, 627 So.2d 192 (La.App. 3d Cir.1993), writ denied, 93-3101 (La.3/18/94), 634 So.2d 850, involves similar facts and the issue of whether consecutive or concurrent sentences are appropriate.
[9] Through Acts 1995, No. 942, §§ 1 and 3, effective August 15, 1995, the Louisiana Legislature repealed the former felony sentencing guidelines enacted by Revised Statute 15:325-329 and amended Code of Criminal Procedure article 894.1.